In the Matter of NATIONAL FUEL GAS DISTRIBUTION CORPORA-
TION, Petitioner, v PUBLIC SERVICE COMMISSION OF THE
STATE OF NEW YORK, Respondent.

Third Department, February 15, 1990

### APPEARANCES OF COUNSEL

*LeBoeuf, Lamb, Leiby & MacRae (Bruce V. Miller* of counsel), for petitioner.

*William J. Cowan (Marilyn Mann Faulkner* of counsel), for respondent.

### OPINION OF THE COURT

LEVINE, J.

In this CPLR article 78 proceeding we are again called upon to review aspects of the determination by respondent concerning the revised tariff filed in August 1987 by petitioner, National Fuel Gas Distribution Corporation (hereinafter NFG), in which NFG sought a revenue increase of $34.7 million *(see, Matter of Multiple Intervenors v Public Serv. Commn.,* 154 AD2d 76 [decided herewith]). Respondent ultimately granted NFG a $14.899 million increase for the rate year ending July 31, 1989. Among the issues resolved in that rate proceeding were the treatment for ratemaking purposes of additional Federal income tax liability incurred by NFG as a result of the Federal Tax Reform Act of 1986 (hereinafter TRA-86; Pub L 99-514) in NFG's fiscal year commencing October 1, 1987 and ending September 30, 1988 and succeeding fiscal years.

Under TRA-86, utilities such as NFG received the benefit of the general corporate Federal income tax rate reduction from 46% to 40% in 1987 and to 34% in 1988, and the resultant

tax savings in 1988 were passed on to NFG's ratepayers in this proceeding. In two pertinent respects, however, TRA-86 mitigated the foregoing tax savings to NFG and other similarly situated public utilities by provisions resulting in additional taxes. First, TRA-86 required utilities to include within taxable income unbilled revenues for the taxable year in which the underlying services are rendered to the customers, rather than to permit them to only report revenues when and as bills for such utility services are actually sent to the customers receiving the services. Thus, in NFG's 1988 fiscal year (Oct. 1, 1987 to Sept. 30, 1988), NFG was required to include as taxable income the revenue represented by services reflected in customer meter readings, but because of the approximately 15-day lag from meter reading to billing, not actually billed to the customers until the succeeding fiscal year. Moreover, under TRA-86, during its first fiscal year after the effective date of TRA-86, NFG was also required to include as taxable income all billed, as well as the foregoing unbilled, revenues when and as billed in that fiscal year, even if such revenues were attributable to services rendered in the preceding fiscal year. The result of these provisions was that, in a single nonrecurring instance, NFG would pay income taxes on approximately 15 days more than one year's revenue. Apparently, these provisions were a purposeful tax revenue-enhancing device under TRA-86 and, under the act, payment of the additional tax liability could be amortized over a four-year period. For NFG, the additional as amortized annual income tax liability was $761,000, based upon $1,782,000 of unbilled revenue, or one quarter of the total unbilled revenue NFG had to report for its 1988 fiscal year. In its rate proceeding before respondent, NFG proposed that the $761,000 increased tax payment it would make for unbilled revenues in fiscal year 1988 be credited as a legitimate tax expense against revenues.

The second pertinent change effected by TRA-86 concerned tax treatment of public utility bad debts. Prior to the passage of TRA-86, utilities were allowed to use the reserve method, based upon estimates of uncollectibles, to account for bad-debt expense for both income tax and ratemaking purposes. Under TRA-86, however, utilities may not use the reserve method and may only deduct actual bad-debt write-offs for tax purposes. Additionally, in the tax year following the effective date of TRA-86, existing bad-debt reserves must be included in taxable income. Again, this was a purposeful one-time tax

revenue-enhancing device, and the increased tax liability could be amortized over four years. Prior to TRA-86, NFG used the reserve method to report bad debts for both tax and ratemaking purposes. Under TRA-86, NFG was required to report as taxable income for the fiscal year ending September 30, 1988 its bad-debt reserve existing on September 30, 1987, resulting in an additional income tax liability for fiscal year 1988 of $419,000. Consistently, with its proposed treatment of its additional tax liability regarding unbilled revenues, NFG sought to include as an operating expense the amortized portion of its tax liability on its prior bad-debt reserve.

Prior to the instant proceeding, respondent had initiated *sua sponte* a proceeding to consider the impact upon utility accounting and rates of the changes effected by TRA-86, inviting input and comments from interested parties. As a result of that proceeding, respondent issued a general policy statement on July 7, 1987 (hereinafter the TRA-86 policy statement). Regarding treatment of unbilled revenues, the TRA-86 policy statement indicated that respondent would undertake further review and that a separate proceeding would be initiated to determine ratemaking treatment of unbilled revenues. As to bad-debt expense, the TRA-86 policy statement noted that some utilities had anticipated the changes resulting from TRA-86 by setting up reserves to cushion the tax on the bad-debt accounts, while others had passed through the prior deductions in either lower customer rates or higher corporate earnings. As to the latter group, respondent determined that they "may claim the increase in current tax expense in revenue requirements; however, re-coupment of these outlays will depend on a demonstration that ratepayers have received the tax benefits of bad debt accruals in the past".

In its determination of NFG's rate proceeding, respondent rejected the utility's proposed treatment, as an operating expense, of its increased income tax liability for unbilled revenues in the fiscal year ending September 30, 1988. Instead, respondent adopted its staff's recommendation to match NFG's 1988 fiscal year's share of unbilled revenues of $1,782,000 with the $761,000 tax expense attributable to those revenues and adding the net balance ($1,021,000) to NFG's 1988 revenues for the benefit of ratepayers in establishing NFG's rates necessary to make up its annual rate of return. Upon review, NFG argues that the foregoing determination lacks a rational basis in failing to credit it for a legitimate,

recoverable income tax expense, in recognizing as revenue for a single rate year some 12½ months of revenues and in turning an actual increased tax liability into an illusory revenue increase, passed on as a windfall to ratepayers. We agree. There is no question that an accurate determination of utility revenues for ratemaking purposes must take into account Federal income taxes payable upon revenues *(Matter of Consolidated Edison Co. v New York State Pub. Serv. Commn.,* 53 AD2d 131, 132, *lv denied* 40 NY2d 803). Thus, the $761,000 1988 tax liability of NFG for unbilled revenues was a properly recoverable expense.

Nor is it deniable that the addition of $1,021,000 of imputed revenues for NFG's 1988 fiscal year represents a matching of more than a year of revenues against 12 months of expenses and does not reflect any enhancement of actual revenues NFG will receive from ratepayers. Thus, NFG correctly notes that, in the former respect, the determination violates a 1977 statement of policy by respondent requiring rates to be fixed on the basis of revenues and expenses for a single test year. Respondent's essential justification for imputing the unbilled revenues attributable to the added tax liability for the rate year (and the next succeeding three years) is the statement in its brief that "[t]o include for ratemaking purposes only the tax expense, as NFG suggests, would skew the rates, leaving uncaptured on a *permanent* basis the income upon which the tax expense was based" (emphasis in original). However, in neither its decision nor in its brief on review has respondent explained why NFG's reporting of *billed* revenues for the utility's fiscal year ending September 30, 1988, and full reporting of actual revenues in succeeding fiscal years, will not accurately reflect NFG's revenues upon which rates should be based, without the addition of unbilled revenues prior to October 1, 1988. This was precisely the point made in the unchallenged rebuttal testimony of NFG's manager of corporate taxes and appears to us to refute respondent's contention that failure to match additional tax liability with the unbilled revenue out of which it arose will "skew" NFG's rates. In the absence of further articulation of a sound rationale for inclusion of the taxed unbilled revenues in the ratemaking equation, the determination in this regard must be annulled and the issue remitted to respondent for reconsideration.

Annulment is also required with respect to respondent's disposition of NFG's proposed inclusion for the rate year of its prorated tax liability of $461,000 on its prior bad-debt reserve.

As previously discussed, in its TRA-86 policy statement, respondent announced that utilities which had not set up a reserve in anticipation of this liability, and who could demonstrate that all income tax deductions allowed under the previously valid reserve method for accounting for bad debts had been passed on to ratepayers, would be permitted to claim the increased tax liability on their reserve as a recoverable tax expense for ratemaking purposes. It is conceded that NFG falls within this category. Respondent, however, disallowed the expense, accepting its staff's position that the tax on the prior reserve should be offset by NFG's expected equivalent tax write-off of actual bad debts in its 1988 fiscal year. Respondent attempts to explain this apparent inconsistency with its TRA-86 policy statement by referring to language in the statement that "the funding for the higher tax payments [for bad debt treatment] under TRA-86 conform to the particular circumstances of each utility", and by claiming in its brief that "only if the * * * [prior] uncollectible reserve will exceed its actual write-offs * * * will the ratepayer truly have received the benefit of the previous tax deduction". However, the reference in the TRA-86 policy statement to the "circumstances" of each utility clearly relates to whether a particular utility had set up a reserve for its additional tax liability or had not "flowed-through" its prior bad-debt reserve deductions to ratepayers. Only as to such utilities, the TRA-86 policy statement holds, would treatment of the additional tax liability as a current expense be disallowed in favor of "normalization" by matching the tax liability against the reserve. The TRA-86 policy statement of respondent repeats, unequivocally, however, that utilities, such as NFG, who "flowed-through" prior deductions to ratepayers were not subject to normalization.

Nor has respondent demonstrated any circumstance peculiar to NFG, among utilities who passed on the benefit of bad-debt deductions to ratepayers under the prior reserve method, that would disqualify NFG from the benefits of the TRA-86 policy statement. Without a sufficient explanation of why it departed from the TRA-86 policy statement in the instant case, or that respondent has, for some good reason, reconsidered the treatment of the tax on a utility's prior debt reserve to add the additional requirement herein imposed on NFG before allowing the tax as a recoverable expense, respondent's determination is arbitrary and capricious and must, therefore,

be annulled *(see, Matter of Field Delivery Serv. [Roberts]*, 66 NY2d 516, 520).

CASEY, J. P., WEISS, MERCURE and HARVEY, JJ., concur.

Determination annulled, with costs, and matter remitted to respondent for further proceedings not inconsistent with this court's decision.