676 So.2d 571 (1996)
GULF STATES UTILITIES COMPANY
v.
LOUISIANA PUBLIC SERVICE COMMISSION.
No. 96-CA-0345.
Supreme Court of Louisiana.
July 2, 1996.
*573 L. Richard Westerburg, Jr., J. Wayne Anderson, Margot Gallup Augustin, for Applicant.
Michael R. Fontham, Brian Andrew Eddington, Wayne Lee, Laurie A. Barcelona, for Respondent.
MARCUS, Justice[*].
This is an appeal from the judgment of the Nineteenth Judicial District Court concerning a rate review ordered by the Louisiana Public Service Commission (commission) in connection with the approval of a merger between Entergy Corp. and Gulf States Utilities Co. (GSU). GSU appealed the district court's decision.
In Order No. U-19904, the commission approved the merger of Entergy Corp. and GSU and directed that within five months of the merger closing, GSU provide the commission with a determination of the Louisiana jurisdictional revenue requirement based on data for the most recent calendar year. The commission indicated it would conduct a review of this data, and if necessary make appropriate adjustments. The merger closed on December 31, 1993, and on May 16, 1994, GSU filed a jurisdictional revenue requirement analysis based on the test year ended December 31, 1993.
After public hearings, the special counsel to the commission filed its report with the commission. Thereafter, the commission issued Order No. U-19904-C. The commission ordered a base rate reduction of $12.657 million with a 10.95% return on common equity effective January 1, 1995. The commission also ordered that one half of the initial balance of $16.667 million in unbilled revenues recorded by GSU as a one time accounting change be credited to the ratepayers, and refused to recognize for ratemaking purposes the accrual method of accounting for post retirement benefits other than pensions (OPEBs). The commission further ordered that the expenses incurred by GSU in litigation involving Cajun Electric Cooperative be disallowed for ratemaking purposes and that a portion of the decommissioning expenses and transmission plant expenses associated with the River Bend nuclear plant be allocated to the deregulated asset portion and excluded from rates. Lastly, the commission ordered that a revenue annualization be adopted based on revenue for residential customers recomputed at year end customer levels.
GSU appealed to the district court. GSU also sought to enjoin that portion of the commission's order relating to the unbilled revenues. The trial judge issued a preliminary injunction, enjoining during the pendency of the appeal that portion of the rate reduction related to unbilled revenues. Subsequently, the trial judge rendered judgment affirming the commission's decision. GSU appealed the judgment of the district court to this court, pursuant to La. Const. Art. IV, § 21(E).
The law applicable to judicial review of the commission was set forth by this court in Central Louisiana Electric Co. v. Public Service Commission, 508 So.2d 1361, 1364 (La.1987), where we described our role in the following way:
Initially, as the orders of the Commission are entitled to great weight, they should not be overturned absent a showing of arbitrariness, capriciousness, or abuse of authority by the Commission. Secondly, courts should be reluctant to substitute their own views for those of the expert body charged with the legislative function of rate-making. Lastly, a decision of the Commission will not be overturned absent a finding that it is clearly erroneous or that it is unsupported by the record.
*574 The six assignments of error raised by GSU in its brief to this court are (1) whether the rate of return on common equity set by the commission was unreasonably low; (2) whether the commission erred in its treatment of the unbilled revenues issue; (3) whether the commission erred in refusing to recognize for rate making purposes the accrual method of accounting for OPEBs; (4) whether the commission erred in refusing to recognize expenses incurred by GSU in the Cajun litigation as reasonable and legitimate operating expenses; (5) whether the commission erred in allocating a portion of the transmission plant investment and decommissioning expenses to the deregulated asset portion of the River Bend plant; and (6) whether the commission erred in adopting a revenue annualization adjustment.

Rate of Return
GSU argues that the commission erred in setting its rate of return on equity (ROE) at 10.95%. GSU contends that the analysis performed by the commission's consultant failed to accurately reflect the risk perceived by investors and the return that investors required to invest in the GSU common stock. It contends that the 12.75% ROE recommended by its expert was more accurate.
The commission's consultant, Richard Baudino, based his recommendation on his analysis using a discounted cash flow (DCF) model. The DCF analysis is premised on the concept that the value of a financial asset is determined by its ability to generate future net cash flows. Stated another way, the value of the stock to the investors is the discounted present value of future cash flows. In the case of common stock, those cash flows come in the form of dividend and appreciation in price. To determine the return on equity, therefore, both the dividend yield and the expected growth rates must be ascertained.
Mr. Baudino calculated a dividend yield of 7.58%, which he calculated by analyzing the dividend picture of seven comparison companies.[1] Mr. Baudino concluded that the growth rate for the comparison group is between 2.56% and 3.88%. After reviewing the 1992, 1993 and 1994 dividend payment history to project when dividends would be expected during the next year and applying the DCF analysis to the expected dividend yield, Mr. Baudino derived a cost of equity range of 10.26% to 11.58%. He used the 10.95% midpoint as a fair and realistic return on common equity for GSU.
GSU's expert, Dr. Bruce Fairchild, also used a form of DCF analysis. Like Mr. Baudino, Dr. Fairchild selected a group of comparison companies, some of which were also included in Mr. Baudino's study. However, instead of using average dividend and pricing information, Dr. Fairchild used spot prices and dividend figures reported either in the July, August or September Value Line Investment Survey. Using the Value Line spot prices and spot dividend projections, Dr. Fairchild arrived at an average dividend yield of 7.7%. Dr. Fairchild then looked at 16 indicia of growth rates, arriving at growth rates of 4%-5%. The growth rate range was added to his 7.7% dividend rate to arrive at a return on equity range of 11.7% to 12.7%.
Dr. Fairchild then performed a series of risk premium calculations. The focus of the risk premium analysis is to estimate the additional return that investors require to forego the relative safety of bonds and bear the greater risk associated with common stocks. That premium is then added to the current yield on bonds. Prominent in this analysis was Dr. Fairchild's observation that as interest rates rise, public utility risk premiums narrow, and, when interest rates decline, risk premiums are greater. Dr. Fairchild used three types of risk premium methodologies: *575 (1) expectational cost of equity estimates, (2) surveys, and (3) realized rates of return. Based on this analysis, he recommended a risk premium cost of equity range of between 12.75% and 13.75%.
The commission adopted the recommendations of Mr. Baudino of 10.95% ROE based on his DCF analysis. The commission found that it had previously relied upon the DCF method when setting the equity return for GSU and other companies. It noted the constant growth form of DCF analyses is the method that has been historically used in regulatory proceedings, and the DCF analysis has been accepted by most state regulatory authorities over the years. In rejecting Dr. Fairchild's recommendations, the commission stated:
Dr. Fairchild's recommendations do not withstand analysis. The analyses are weighted in a fashion that results in unreasonably high projections. First, Dr. Fairchild started with a preconceived range that excludes consideration of low end rates of return, but includes unreasonably high upper limits. This approach skews the outcome of both his DCF and his risk premium analysis. When critically reviewed, this DCF analysis results in a projection comparable to that recommended by Mr. Baudino. The expectational risk premium analyses employed by Dr. Fairchild mechanically applied historic data to current interest rates. The survey analysis depends upon the opinions of unidentified institutional investors. The rate of return analysis incorporates the CAPM [capital asset pricing model] analyses, which Dr. Fairchild acknowledged is a less reliable analytical model for studying utility stocks.
GSU argues that the commission's adoption of Mr. Baudino's recommendation, giving little or no consideration to Dr. Fairchild's recommendation, is arbitrary and capricious. We find no merit to this argument. The general rule is that a regulatory body may use its own judgment in evaluating evidence as to a matter within its expertise; it is not bound by even uncontradicted testimony of experts which amount to mere opinions on their part. Baton Rouge Water Works Co. v. Louisiana Public Service Commission, 342 So.2d 609, 611 (La.1977).
In the instant case, the commission concluded that Mr. Baudino's DCF analysis adequately addressed the concerns raised by GSU, such as its business condition and the uncertainties associated with its ownership of a nuclear plant. The commission gave lengthy and cogent reasons for its rejection of Dr. Fairchild's analysis, finding it was unduly slanted toward the high end. Under these circumstances, we are unable to conclude that the commission acted in an arbitrary and capricious manner in setting GSU's rate of return.

Unbilled Revenues
GSU argues the commission improperly ordered that the $16.662 million of unbilled revenues resulting from an accounting change be divided equally between the ratepayers and the shareholders. GSU contends that these unbilled revenues were really payment for electric service it had previously rendered in December, 1992, and the effect of the commission's decision was to give its customers some of their December, 1992 electricity for free.
In order to properly resolve this issue, it is necessary to understand the background of utility billing practices. Historically, utilities used the "meters read" method of accounting. Under this method, the utility did not record on its books the revenues to which it was entitled as a result of providing electric service until after it read the customer's meter and rendered bills based on those meter readings. Since the December meter reading would usually take place near the middle of the month, any electricity delivered after this reading would not be placed on the company's books until the following year, when the January meter reading took place.[2] The revenue for this period (consisting of *576 approximately ten days) is termed "unbilled revenue." The federal Tax Reform Act of 1986 required utilities to include within taxable income unbilled revenues for the tax year in which the underlying services were rendered to the customer. See National Fuel Gas Distribution Corp. v. Public Service Commission, 154 A.D.2d 31, 551 N.Y.S.2d 636 (1990).
Thereafter, GSU switched to the unbilled revenues method of accounting for tax purposes, but continued to use the meters read method for its financial accounting. In 1991, in a rate increase proceeding before the commission, GSU indicated that it may switch to the unbilled revenues method for financial accounting. The commission's consultant testified that such a switch would not, on an ongoing basis, affect the revenue requirement. The commission adopted the recommendation of its consultant and ordered that GSU "defer for future review and consideration by the Commission any initial gain from a change in accounting, if the company should make such a change." GSU elected to initiate unbilled revenue accounting on its financial books effective January 1, 1993. This resulted in an accrual of an initial balance of $16.662 million, consisting of eleven days of revenue from December 20-31, 1992.
In the present proceeding, the commission's consultant, Lane Kollen, recommended that the entire $16.662 million be amortized over approximately three years as a cost of service reduction.[3] By contrast, GSU's expert, Kenneth Gallagher, argued that the entire balance should be immediately amortized to GSU, contending that the balance represented revenues for services rendered. The commission's special counsel took a middle course, recommending that the $16.622 million be allocated equally between ratepayers and GSU, observing that the income accrual is the type of one-time windfall that often is shared between investors and consumers. The commission adopted this recommendation and ordered GSU to amortize one-half of the total accrual ($8.33 million) effective January 1, 1995.
GSU contends that the effect of the commission's order is to add $8.33 million of 1992 revenue (resulting from approximately five days of December, 1992) to the 1993 test year, resulting in a mismatch of approximately 370 days of revenue (i.e., 365 days of 1993 revenue plus five days of 1992 revenue) to 365 days of 1993 expenses. GSU argues that through a prospective reduction in rates, it is being required to give back to customers the extra five days of revenue, even though no extra payments were actually made by its customers. It concludes that this money is simply payment that is owed to it by its customers for electricity delivered to them during December, 1992.
We see merit to GSU's argument. While on its face, the commission's decision purports to match 365 days of 1993 revenue with 365 days of 1993 expenses, it is clear that the effect of the commission's action is to place five extra days of 1992 revenue into the 1993 test year, thus creating a mismatch between revenue and expenses. Contrary to the commission's reasoning, the $16.622 million does not represent a "windfall" to GSU, but simply represents money owed to GSU for services rendered during the last days of December, 1992.
Other courts addressing this issue have reached similar conclusions. In National Fuel Gas Distribution Corp. v. Public Service Commission, 154 A.D.2d 31, 551 N.Y.S.2d 636, 638 (1990), the court annulled the determination of the New York Public Service Commission, which had added unbilled revenues into the test year, noting that the commission's decision represented "a matching of more than a year of revenues against 12 months of expenses and does not reflect any enhancement of actual revenues [the utility] will receive from ratepayers." Likewise, in Petition of Interstate Power Co., 419 N.W.2d 803, 805 (Minn.App.1988), the court affirmed the Minnesota Public Utilities Commission's determination that since unbilled revenues were not included in the test *577 year, the tax expense associated with the unbilled revenues should not be included. The court cited the commission's reasoning that unbilled revenues should not be included in the test year rate calculation, since this would "result in an inappropriate mismatch because the test year would contain 365 days of cost but more than 365 days of revenue."
In support of its order, the commission attempts to analogize the unbilled revenues to the income gain from the sale of generating assets at issue in Gulf States Utilities Co. v. Louisiana Public Service Commission, 92-1185 (La. 3/17/94), 633 So.2d 1258. In Gulf States, the utility sold generating assets which had been paid for by the ratepayers through depreciation reflected in base rates. The utility then attempted to pass along an "asset fee" to its ratepayers as part of a fuel adjustment clause. The thrust of our holding was simply that the utility could not make ratepayers pay twice for an asset they had already paid for. Gulf States is clearly distinguishable from the instant case, since there is no suggestion that GSU is seeking a double recovery.
The commission also analogizes its treatment of the unbilled revenues to its prior action allowing GSU to defer expenses. For example, it argues that in 1986, GSU was allowed to defer eighteen months of expenses resulting from the River Bend nuclear plant until the commission issued its rate order in 1987. As a result, GSU was allowed to collect, through higher rates over a ten year period, the eighteen months of expenses previously deferred. The commission argues that this created a mismatch between expenses and revenue, yet GSU did not object to this treatment.
While at first blush this argument appears to have some merit, we believe it is distinguishable from the present situation. The problem of dealing with extraordinary expenses arises from the prohibition against retroactive rate making, since future rates may not be designed to recoup past losses. See Louisiana Power & Light Co. v. Louisiana Public Service Commission, 523 So.2d 850 (La.1988). Therefore, the only way the commission may allow a utility to recoup past losses is to order the establishment of a deferral as of the date of its order and the right to collect the deferred amount in the future. Id. at 857, n. 4. By contrast, there are no similar policy considerations supporting the deferral of revenues properly earned in one year into the next year. Stated another way, the allowance of deferred expenses is a limited exception to the general rule that expenses and revenues must be matched, and that exception is not applicable in this case.
Lastly, the commission relies on the opinion of the District of Columbia Public Service Commission in Re Potomac Electric Power Co., 150 PUR4th 528, 1994 WL 109204 (D.C.P.S.C.1994), which amortized the full amount of unbilled revenues to ratepayers over five years, requiring the base rate to be reduced by the unamortized amount of the accounting change. A review of this decision shows it is not supported by persuasive reasoning.[4] We conclude that the authorities we have cited set forth the proper resolution of this issue.
In sum, we hold that the commission's order fails to state an adequate basis as to why the $16.622 million accrual should be allocated between the ratepayers and GSU. Accordingly, we must find that the commission's determination of this issue is arbitrary and capricious.

Accounting for Post Retirement Benefits Other Than Pensions
GSU argues that the commission erred in failing to recognize the accrual method of accounting for post retirement benefits other than pensions, known as "OPEBs." GSU contends that since it is now required to account for OPEBs on an accrual basis for financial reporting purposes, it should be allowed to do so for ratemaking purposes.
OPEBs have traditionally been accounted for by utilities on a pay-as-you-go basis. Under *578 this method, the payment of OPEBs (such as medical, dental and insurance costs) were recorded as expenses when the utility actually made the payment to the retiree. In 1993, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards No. 106 (SFAS 106) which required utilities to change to the accrual method of accounting for OPEBs for financial reporting purposes. Under this method, utilities were required to accrue and record OPEB expenses during the period of time in which the retiree is providing services to the employer. The amount of expense booked in a given year is based on the present value of an estimate of future post retirement benefits attributable to service provided in that year.
In early 1993, the commission conducted an industry-wide investigation to determine whether SFAS 106 should be followed by Louisiana utilities for ratemaking purposes. GSU, along with other utilities, actively participated in this proceeding. Subsequently, the commission issued Order No. U-20181 in which it ordered the utilities to remain on the pay-as-you go accounting methodology for OPEBs for ratemaking purposes. The commission found that the accrual method had numerous negative consequences, since the estimates were speculative. It pointed out that the switch from pay-as-you-go accounting to the accrual method would dramatically affect rates, amounting to more than a $20 million increase in the first year alone for estimates of future costs. It found that continued use of the pay-as-you-go method would not impact the financial strength of the utilities. Although it recognized that the pay-as-you-go method may have a negative impact on the utilities' book earnings, it stated that the utilities "may apply to the Commission for approval of the use of a regulatory asset to bridge the gap between ratemaking and accounting, to be amortized on a pay-as-you-go basis" to alleviate the negative impact on the utilities' book earnings.
In the instant proceeding, GSU asked the commission to reconsider its decision in Order No. U-20181. It presented the testimony of its expert witness, Kenneth F. Gallagher, who testified that the use of the pay-as-you-go treatment for ratemaking purposes has caused GSU to suffer a reduction of earnings for financial reporting purposes. He indicated that SFAS 106 had been adopted by a number of regulatory agencies around the country. In order to alleviate concerns about the reliability of estimates, he testified that GSU was prepared to deposit amounts for OPEBs into an external trust fund and dedicate these funds to payment of future OPEB costs.
The commission's consultant, Lane Kollen, recommended that the commission continue the pay-as-you-go method ordered in the previous proceeding. The commission adopted this recommendation:
Notwithstanding the action that may have been taken by other commissions, the Louisiana Commission has already resolved the treatment to be afforded to OPEB expenses. The Commission conducted an extensive investigation into the SFAS No. 106 issue in Docket No. U-20181. The docket was conducted as a generic docket in order to avoid litigating the issue repeatedly for each utility within the Commission's jurisdiction. The Company did not appeal Order No. U-20181. Mr. Gallagher acknowledged that he presented in Docket U-20181 the same arguments that he presented here. Neither GSU nor Mr. Gallagher present any arguments that were not already addressed in the generic docket. Consistent with Order No. U-20181 the Commission adopts Mr. Kollen's adjustment.
GSU argues that the commission acted in an arbitrary and capricious manner in failing to reconsider its position on recognizing the accrual method of accounting for OPEBs.
We find no merit to this argument. A review of Order No. U-20181 shows that the commission extensively considered the same arguments now raised by GSU and rejected them, based on concerns that the accrual method was speculative and would adversely affect rates. The commission recognized that the use of the pay-as-you-go method may have a negative impact on the utilities' book earnings, but suggested a method to *579 alleviate this problem. Based on these findings, we are unable to conclude the commission was arbitrary and capricious in failing to reconsider its position on recognizing the accrual method of accounting for OPEBs.

Cajun Litigation Expenses
GSU argues the commission erred in disallowing $1.73 million in litigation expenses which were incurred in its defense in a fraud suit brought by Cajun Electric Power Cooperative (Cajun). GSU contends the costs it incurred in the Cajun litigation were necessary and reasonable expenses incurred in the conduct of its utility business and are properly recoverable from the ratepayers.
The Cajun litigation arose over Cajun's investment in the River Bend nuclear plant, of which Cajun owned 30% and GSU owned 70%.[5] Cajun filed suit in federal district court against GSU in June, 1989, alleging that GSU fraudulently induced Cajun to participate in the project. In the present proceeding, GSU included $1.73 million of expenses incurred in the Cajun litigation in 1993. In disallowing this expense, the commission stated:
Special Counsel recommended that the Cajun fraud litigation cost be excluded. In the lawsuit, Cajun alleged that Gulf States fraudulently induced Cajun to invest in River Bend. The litigation could result in bankruptcy for either Gulf States or Cajun, depending upon the outcome. Clearly, the costs are unusual and non-recurring in that they are abnormally large, and such claims are highly unlikely to recur. The ratepayers should not be required to bear the cost of defending the Company against substantial allegations of fraud, especially where the alleged fraud relates to inducements to cause third parties to invest in a project already found to be imprudent by the Commission. Gulf States invited Cajun to invest in River Bend to help avoid the write-off that could otherwise have followed from the Commission's disallowance of a portion of River Bend. The ratepayers should not have to bear the extraordinary costs arising out of the ensuing fraud litigation. The Commission reached a similar result when South Central Bell was the subject of an antitrust suit brought by the U.S. Department of Justice. Ex Parte South Central Bell Tel. Co., LPSC Order No. U-14673, 41 PUR 4th 298 at p. 305-306 (1981). The Commission adopts Special Counsel's recommendation, and will disallow the costs.
Subsequent to the commission's order, the federal district court rendered judgment in favor of GSU in Phase I of the litigation, rejecting Cajun's allegation of pre-contract fraud.[6] The court has not yet heard the second phase of the case, which involves allegations of fraud during the contract. Recently, the trustee in Cajun's bankruptcy suit announced a settlement of the litigation which requires GSU to take back Cajun's share of River Bend, but provides for Cajun to fund the decommissioning costs for the unit.
GSU argues that the commission erred in disallowing the litigation expenses simply because Cajun alleged fraud on its part. Moreover, GSU contends there was no factual basis for the commission's determination that the litigation expenses were unusual, abnormal or non-recurring.
Although we agree with GSU that the mere allegation of fraud in a lawsuit against a utility would not be a sufficient basis to disallow litigation expenses, we find that under the facts as a whole, the commission correctly disallowed the litigation expenses. The underlying basis of Cajun's suit was that GSU's management fraudulently induced Cajun to participate in the River Bend project, a project which we have previously held was imprudent on GSU's part. Any judgment in this case against GSU would have affected its shareholders, not the ratepayers. Therefore, it is clear that the defense of this suit by GSU benefited its shareholders, not the ratepayers. Moreover, it appears that these litigation *580 expenses were unusual and not likely to recur. Based on these facts, we are unable to conclude that the commission was arbitrary and capricious in disallowing these litigation expenses.

Allocation of Decommissioning Expense and Transmission Costs
GSU argues the commission erred in allocating decommissioning expenses of the River Bend plant between the regulated and deregulated portions. GSU further contends that the commission erred in disallowing a portion of the cost of the transmission plant[7] associated with River Bend.
In 1987, the commission adopted an order excluding $1.4 billion of GSU's River Bend investment from the rate base, based on its determination that GSU could have and should have built a coal plant of the same size as River Bend for $1.4 billion less. That determination was affirmed by this court. Gulf States Utilities Co. v. Louisiana Public Service Commission, 578 So.2d 71 (La.1991). Subsequently, the commission approved a deregulated asset plan, which essentially split up GSU's share of River Bend, permitting the company to keep most of the benefits of about 150 megawatts of the asset. This approach allowed it to avoid writing off the $1.4 billion disallowance. Under the deregulated asset plan, the commission adopted the principle that all expenses and investment in River Bend be allocated between the regulated and deregulated portions of River Bend, but an express exception was made as to decommissioning expenses.
In the instant proceeding, the commission's consultant and special counsel recommended that the commission reconsider the treatment for decommissioning expenses and order that future decommissioning expenses be allocated between regulated and deregulated River Bend, including only the regulated percentage in the regulated cost of service. The commission adopted this recommendation. The commission also allocated the expenses of the River Bend transmission plant between the regulated and deregulated components of the deregulated asset plan, finding this treatment was consistent with its prior treatment of the other investments and expenses associated with River Bend.
As to the decommissioning expenses, GSU argues the commission's decision constitutes an additional imprudence disallowance, since the commission had previously held that all decommissioning costs were excepted from the deregulated asset plan and could be recovered through the rate base. GSU contends that the ratepayers have a significant public interest in the decommissioning, since it involves issues of public health and safety in connection with the removal of nuclear wastes and facilities.
We find no merit to GSU's argument. Although we recognize that the commission initially made an exception to the deregulated asset plan for the decommissioning expenses, the commission's present order is consistent with its treatment of other expenses arising from River Bend. Since GSU receives the benefit from the deregulated portion of River Bend, it logically follows that it should bear the decommissioning expenses for this portion.
As to the transmission plant costs, GSU argues there was no basis to exclude a portion of these costs from the rate base. GSU relies on the testimony of its expert witness, J. David Wright, who stated that the original disallowance was based on the difference between a nuclear plant and a coal plant, but that the transmission plant would have been necessary regardless of what type of plant had been built.
In rejecting this argument, the commission stated:
Mr. Wright's argument is misplaced and does not warrant inclusion of the full general and transmission plant in the rate base. Mr. Wright's argument misconstrues the history of River Bend. The "coal plant" proxy that he refers to predated the Commission's adoption of the *581 Deregulated Asset Plan. Prior to adoption of the Deregulated Asset Plan, the Commission permitted Gulf States to recover from ratepayers all River Bend operating expenses. With the adoption of the Deregulated Asset Plan, the Commission established the principle of allocating all investment and operating expenses (except for decommissioning expenses discussed supra) between regulated and deregulated components of the Deregulated Asset Plan. Simply stated, the general and transmission plant is needed for the service and operation of the deregulated portion of River Bend.
We think the commission properly resolved the issue. Since the transmission plant is necessary for both the regulated and deregulated portions of River Bend, it would be unfair to require the ratepayers to shoulder all the costs.
In sum, we find that the commission's decisions on the allocation of the decommissioning expenses and transmission plant costs are consistent with its earlier deregulated asset plan. Accordingly, we are unable to conclude these decisions are arbitrary and capricious.

Revenue Annualization
GSU argues the commission erred in adjusting revenues to reflect an annualization of the effect of an increase in the number of customers at the end of the test year. As a procedural matter, GSU contends that the commission's consultant, Lane Kollen, did not propose this adjustment until November 7, 1994, one week before hearings were scheduled to begin. It argues that this late proposal denied it an opportunity to meaningfully respond to the adjustment. On the merits, GSU argues that the commission erred in adopting the annualization as to revenues only, without making corresponding adjustments to the rate base and expenses.
The commission concluded that GSU had an adequate opportunity to respond, finding GSU conducted extensive cross examination of Mr. Kollen regarding the annualizations. The commission also found GSU introduced testimony of Mr. David Wright that specifically addressed the computations and components of the rate base and expense annualizations. Based on these findings, the commission concluded that the evidence of the annualizations was properly admitted.
On the merits, the commission's consultant, Mr. Kollen, proposed the revenue annualization to deal with the fact that GSU experienced growth in its billing determinants and in the number of customers over the year. Instead of the revenues stated in GSU's filing, Mr. Kollen proposed that revenues for residential customers be recomputed at year end customer levels. Under this proposal, test year revenues were increased to the level of revenues that would have been produced if, in each month of the test year, GSU had been serving as many residential customers as it served in the last month of the test year.[8] Mr. Kollen also proposed that GSU's rate base be adjusted and expenses be annualized. However, the special counsel recommended against adoption of the adjustments for the rate base and the expense annualizations because of the "lack of clarity" regarding the quantification of the adjustment. The commission adopted the special counsel's recommendation:
The record is left with no clear, single quantification of the rate base and operating expense annualizations. The result of the adjustments still appears to be a likely reduction in the revenue requirement. Under the circumstances, the Commission accepts the recommendation of Special Counsel that no adjustment be made on the basis of the rate base and operating expense annualizations. However, the Commission directs that Gulf States and the Commission's consultants evaluate the appropriateness and benefits of annualizationing adjustments in future review proceedings.
GSU argues that the commission erred in adopting the revenue annualization without corresponding adjustments to the rate base and operating expenses, something which the commission's own consultant testified was improper. GSU contends the effect of the commission's action is to create a mismatch among revenues, expenses and the rate base.
*582 We see merit to GSU's argument. The commission has advanced no logical reason why the revenue annualization should be adopted without corresponding adjustments to the rate base and expenses. The commission implies that its failure to adopt the rate base and expense annualization adjustments was actually beneficial to GSU, since the adjustments, if correctly calculated, would have resulted in a larger rate decrease for GSU than that reflected in the commission's order. However, this is contrary to the testimony of GSU's witness, who calculated that the adjustments would have resulted in a slight revenue increase of approximately $2 million.
It appears that many of the difficulties in connection with the annualization adjustments can be traced to the short time frame in which the commission sought to introduce this issue. The commission's conclusion that GSU had adequate time to respond on this issue is belied by its finding that the commission's own consultant was unable to properly calculate the rate base and expense adjustments at the hearing. While we do not mean to imply that the commission could not adopt annualization adjustments, we think the procedural deficiencies in the way the issue was raised in the instant proceeding, combined with the internal inconsistencies of adopting a revenue annualization without corresponding rate base and expense adjustments, mandate a finding that the commission's action was arbitrary and capricious. Accordingly, we will vacate this portion of the commission's order and remand the case to the commission to hold a new hearing.

DECREE
For the reasons assigned, the judgment of the district court is reversed insofar as it affirms the commission's order on the issue of unbilled revenues and annualization adjustments. In all other respects, the judgment is affirmed. The case is remanded to the commission for further proceedings consistent with this opinion.
NOTES
[*] Johnson, J. not on panel. Rule IV, Part 2, § 3.
[1] GSU stock is not publicly traded, so Mr. Baudino used electric utilities as a proxy for GSU. He selected seven electric utilities that have the same Value Line safety rank and the same Moody's bond rating. Mr. Baudino excluded companies that derived less than 80% of total revenues from electric operations, that had significant diversified activities, or that had recently reduced dividends or for which Value Line was forecasting dividend reductions. Mr. Baudino then calculated the average dividend yield for each company by dividing the annualized dividends as reported in Standard and Poor's Stock Guide and the Wall Street Journal for the preceding six month period, by the average monthly prices for the same period. Those averages were then used to reach a comparison group dividend yield of 7.58%.
[2] For example, if the customer's meter was read on December 20, 1991, he would then receive a bill for the previous month's service (i.e., November 20December 20, 1991). The customer would then receive electric service from December 21December 31, 1991, but would not receive a bill for this service until the next meter reading, which would occur in January, 1992.
[3] Similar recommendations by Mr. Kollen were rejected by the Pennsylvania Public Utility Commission and the Kentucky Public Service Commission. See Pennsylvania Public Utility Commission v. Philadelphia Electric Co., 74 Pa. PUC 1 (1990); In Re Louisville Gas and Electric Co., 119 PUR 4th 431, 1990 WL 488821 (Ky.P.S.C. 1990).
[4] One of the reasons given by the D.C.Public Service Commission for its order was that "to ignore this accrual adjustment would be inconsistent with our determination that it is appropriate to recognize the Company's OPEB accrual adjustment." Interestingly, in the instant case, the commission has refused to recognize accrual accounting for OPEBs.
[5] The commission had previously found GSU's River Bend investment to be imprudent. This court upheld that determination in Gulf States Utilities Co. v. Louisiana Public Service Commission, 578 So.2d 71 (La.1991).
[6] Cajun Electric Power Co. v. Gulf States Utilities Co., No. 89-474-B (M.D.La. October 24, 1995).
[7] The transmission plant is essentially a step-up transformer that is used for the transmission of electricity generated at River Bend.
[8] The calculated growth to the GSU's revenues from the added customers was $1,521,000.