JOHNSON, J.,
dissenting.
|H respectfully dissent. Contrary to the majority’s opinion, I have concluded that the decision of the Council of the City of New Orleans (“Council”) to allow Entergy New Orleans (“ENO”) to pass System Fuels, Inc.’s (“SFI”) Period Costs through its fuel adjustment clause from 1985 through 2000, and not require ENO to refund these costs to its customers, was arbitrary and capricious. In my view, the record supports a finding that passing the SFI Period Costs through the fuel adjustment clause was improper, that ENO knew that this practice was improper, and that these costs, because of their character, should have been included in ENO’s base rate.
SFI is a subsidiary of Entergy. SFI owns and leases oil storage facilities and transportation equipment and purchases fuel oil for ENO to use in its generating stations. In addition to charging ENO for the actual costs of the oil delivered, SFI charges “Period Costs,” which are not direct costs of fuel and are not generation dependent. Period Costs are administrative costs such as operating costs, depreciation and amortization of annual charges for the costs associated with ^depreciable assets owned by SFI, interest costs, and taxes other than income taxes (such as property taxes). These costs were incurred by SFI, charged to ENO, and passed on by ENO to its ratepayers through its fuel adjustment clause.
In Daily Advertiser v. Trans-La, 612 So.2d 7 (La.1993), this Court extensively explained the nature and purpose of fuel adjustment clauses:
An automatic fuel adjustment clause is a device to permit rates to adjust automatically, either up or down, in relation to fluctuations in certain, narrowly defined, operating expenses. Such clauses usually embody a formula established during a rate hearing to permit adjustment of rates in the future to reflect changes in specific operating costs, such as the wholesale cost of gas or electricity. Simply put, such clauses permit utilities to pass through to their customers fuel costs as they are incurred, and thus the amount the customer pays for the utility service varies directly with the amount the utility spends to produce the sendee.
Daily Advertiser, 612 So.2d at 11, n. 1 (internal citations omitted)
This Court noted that “[a]utomatic fuel adjustment clauses are widely-accepted rate making tools utilized to allow a utility to recoup fluctuating fuel costs on an ongoing basis.” Id. at 22. We further noted that “[cjommissions employ such clauses when they encounter an item of expense, such as fuel costs, that tends to be more volatile in comparison to the utility’s other costs,” and that “[sjuch clauses permit fluctuations in the utility’s costs to be passed through directly to its customers as cost adjustments in subsequent utility bills.” Id.
In distinguishing these rates from typical “commission-made” rates, we explained that:
“Commission-made” rates are those rates which are implemented subsequent to an exhaustive evidentiary presentation of the utility’s expenses and their reasonableness. The distinction between rates implemented pursuant to automatic fuel adjustment clauses and “commission-made” rates is that while the latter are the result of a full- *85 fledged rate proceeding in which the reasonableness of all the utility’s costs are reviewed, the former are implemented automatically with no antecedent reasonableness review.
Id. at 23 n. 26 (internal citations omitted).
[■¡Moreover, we explained that “fuel adjustment clauses are not designed to allow the utility to earn a profit; rather, they are recoupment devices designed to permit a dollar-for-dollar recovery of fluctuations in fuel costs.” Id. at 24 (internal citations omitted).
This Court further found that “automatic fuel adjustment clauses are an integral part of the rate making process, are subject to ongoing commission regulation, and can be adjusted retroactively by the commission to require the utility to refund overcharges to its customers.” Id. at 26.
Base rates were explained by this Court in Entergy Gulf States, Inc. v. Louisiana Public Service Commission, 1998-0881 (La.1/20/99), 726 So.2d 870:
Base rates consist of the predictable costs that are known and measurable, such as capital expenditures, which should only be considered in a base rate proceeding in which the Commission examines the value of the asset, considers a depreciation expense recoverable over the life of the asset, and adjusts the base rate of electricity to reflect the capital outlay for that project, and any other capital expenses, such as financing costs, etc. of regulatory assets. The Commission then approves or disapproves the rate increase/decrease based on its evaluation of the Company’s expenses.
Entergy Gulf States, 726 So.2d at 873.
Because of the nature of the SFI Period Costs, they should have been included in ENO’s base rate, rather than passed to ratepayers through ENO’s fuel adjustment clause. At the administrative trial of this matter, numerous experts testified regarding the SFI Period Costs. All experts, other than ENO’s own experts, concluded that ENO improperly included the SFI Period Costs in its fuel adjustment clause, and all recommended that these improperly billed costs be refunded to the ratepayers.
| ¿Robert Janssen testified on behalf of the plaintiffs.[1] Mr. Janssen testified that SFI, a subsidiary of ENO, was “established in 1972 to purchase, finance, and store oil for the Entergy utilities, and that these utilities, including ENO, pay for the costs to operate SFI.” These costs are designated in the record as “Period Costs.”
Mr. Janssen opined that these SFI Period Costs were improperly included in ENO’s fuel adjustment clause because they are non-fuel base rate type overhead costs. In addition, ENO failed to get explicit approval from the City Council to include these costs in its fuel adjustment clause. Although ENO had been expressly informed that SFI Period Costs were not fuel costs appropriate to include in the fuel adjustment clause,[2] ENO continued to *86 include them in their billings, even during years when ENO was under a base rate freeze.[3] He testified that the amount of these overcharges, due to improper inclusion, was approximately $26.7 million dollars for the period June 1985 to June 2001. Of the $26.7 million dollars, $14.1 million dollars were improperly included in Enter-gy’s fuel adjustment clause during a base rate freeze. He recommended that the Council refund these charges.
| ,-,In making his recommendation, Jans-sen relied on Council resolutions and the general principles and guidelines found in proceedings before the Federal Energy Regulatory Commission (“FERC”) and the Louisiana Public Service Commission (“LPSC”). He testified that ENO never received City Council approval to include Period Costs in its fuel adjustment clause, and, according to the principles developed by the FERC and the LPSC for reviewing fuel adjustment clauses, explicit approval of these Period Costs for collection through ENO’s fuel adjustment clause, or explicit approval of the fuel adjustment clause itself, is required before the fuel adjustment clause rate can be deemed finally proved.[4] Janssen also testified that, *88 based on |7General Order in Docket No. U-21497, it is clear that the LPSC considers, as a general principle, that any costs other than direct fuel generation dependent costs must not be included in fuel adjustment clauses of electric utilities in Louisiana under its jurisdiction.[5]
Janssen further opined that it was irrelevant whether the charges were prudent or not. He testified that even if prudently incurred, improperly including SFI Period Costs in a fuel adjustment clause circumvents the Council’s authority in numerous ways: improper inclusion of these costs during a base rate freeze allows a utility to recover costs that it would not have otherwise been able to recover since it could not request a base rate increase;[6] allows a utility to depreciate assets over a shorter time period that would be required in its base rates, which causes current customers to pay [smore for a utility’s assets than they should;[7] allows a utility to avoid the cost recovery lag that is inherent in rate base processing, and thus the utility over-recovers its costs; prevents the council from reviewing the utility’s recovery of the cost concurrently with all other similar costs, which thwarts the Council’s ability to evaluate other rate-making issues that could potentially offset the cost effect of the improperly included costs; tends to undermine utility incentives to bargain vigorously, may promote inefficient conduct, and may lead to cost misallocations and could permit a utility to over recover its costs.
Janssen further testified that, according to one of its own internal reports in 1987, Entergy personnel were concerned that if the Council’s attention was drawn to ENO’s recovery of Period Costs through its fuel adjustment clause, it would no longer be able to recover these costs.[8] He *89 testified that it was clear that ENO has known since that time that Period Costs were improperly included in ENO’s fuel adjustment clause and that this inclusion would not withstand Council scrutiny.
Kennan Walsh testified as the expert for the Council’s advisers.[9] Mr. Walsh testified that there was an improper inclusion of SFI Period Costs in ENO’s fuel adjustment clause filings after April, 1985, and that the effect of including non-fuel, fixed SFI Period Costs in its fuel adjustment clause resulted in the over-collection of nearly $25,750,000.00. For the year 2000, there was an additional over-collection of nearly $666,000.00 of SFI Period Costs through ENO’s fuel adjustment clause. Mr. |9Walsh opined that ENO’s treatment of SFI Period Costs violated Council Resolution Nos. R-76-135 and R-76-179 regarding its treatment of SFI Period Costs. He opined that the resolutions provided that these costs are non-fuel related fixed expenses and thus should not be recovered through the fuel adjustment clause.
Mr. Walsh also testified that several independent reviews were conducted of ENO’s fuel adjustment clause mechanisms. As a result of one such review, by CPA accounting firm Ernst & Young in 1991, the firm stated:
Although excluding these charges would not decrease monthly electric fuel adjustment charges by an appreciable amount, the relatively fixed and predictable nature of this non-fuel expense makes recovery through electric base rates more appropriate. Such a change in the manner in which SFI [Pjeriod [Cjosts are recovered should be considered in the context of NOPSI’s next application for rate relief.
Based on the Ernst & Young review, Mr. Walsh indicated that Entergy was advised to apply for a base rate increase as it made the “recovery through base rates more appropriate.” However, he indicated that ENO never attempted to change its mechanism of recovery for non-fuel SFI Period Costs through the fuel adjustment clause.
He further indicated that in 1990, another independent examination was conducted by the FERC.[10] This examination determined that ENO used the wrong expense accounts to classify search in all stores costs assigned by SFI lending. He testified that this independent review gave further support to Ernst & Young’s recommendations. He stated that the FERC made its recommendations and findings based on an audit of ENO’s records from the period of January 1, 1990 through December 31, 1993. He testified that specifically, the FERC found:
a. SFI incurred rent and other expenses for oil storage tanks it leased and expenses such as inspecting, loading, unloading, repairs, maintenance, clean-up, rent, property taxes, depreciation, and leasehold improvements for tanks it owned.
[inb. Besides tank storage costs, SFI incurred administrative expenses and interest related to the acquisition and storage of oil inventory, c. SFI billed its costs related to the oil program each month to those Operating Companies, including ENO, that had an ownership share in SFI.
*90 d. ENO classified its allocated share of Period Costs billed by SFI in the Uniform Systems Account designated as “Account 501, Fuel.”
e. ENO should have classified the various costs billed by SFI as if it incurred the costs directly in various operating expense accounts, instead of using Account 501.
f. Recommended that ENO adopt the necessary procedures to ensure it classifies charges from SFI effective January 1, 1997, according to the appropriate expense accounts.
g. Noted that in a coverletter dated February 26, 1997, ENO agreed in a letter to the FERC dated February 19, 1997, that it would adopt the FERC’s recommendations.
Mr. Walsh testified that although the FERC “implied” that ENO would adopt its recommendations to change its accounting practices of reporting SFI Period Costs in Account 501, ENO responded to the FERC via letter on February 19,1997, setting forth its desire to continue reporting SFI Period Costs in Account 501. ENO reiterated the same stance in two subsequent letters to the FERC dated May 8 and May 28, 1997, respectively.[11]
Mr. Walsh stated that ENO admitted that it was aware that SFI Period Costs were fixed costs in a letter dated February 28, 1996. He opined that had ENO followed the FERC’s recommendation to report SFI Period Costs to the appropriate account, rather than to Account 501, these Period Costs would not have been passed on to ENO’s customers via the fuel adjustment clause.
_JjiMr. Walsh concluded that ENO had not adhered to the Council’s resolutions through its improper inclusion of SFI Period Costs in its fuel adjustment clause filings. He testified that these costs are non-fuel related fixed expenses that should not be recovered through the fuel adjustment clause.
John H. Chavanne, testified as an expert for the Sewerage & Water Board, interve-nor in this matter.[12] He agreed with the conclusions of Mr. Janssen and Mr. Walsh that SFI Period Costs were improperly included in ENO’s fuel adjustment clause filings from May 1985 to date. Mr. Cha-vanne testified, “as non-fuel costs, SFI Period Costs are not properly recoverable through ENO’s fuel adjustment clause.” He further opined that in Entergy’s fuel adjustment clause, the language itself indicates that it just refers to fuel costs, and not non-fuel costs.
Steven Ruback also testified on behalf of the Plaintiffs.[13] He was qualified as an expert in “fuel adjustment clause analysis *91 and policy.” He found that the consequence of ENO’s inclusion of SFI Period Costs in its fuel adjustment clause has been the over-recovery of Period Costs, which have inappropriately flowed through ENO’s fuel adjustment clause to ratepayers.
Mr. Ruback testified that there are two basic and important aspects of fuel adjustment clause regulation, the most important of which is that the fuel adjustment clause is an exception to the long-standing and well-established principles used to set base rates. Fuel adjustment clauses are also an exception to the regulatory compact because fuel adjustment charges, particularly automatic fuel adjustment clauses, only require a perfunctory hearing, and effectively strip a utility of an important incentive hato minimize the costs flowing through the fuel adjustment clause, and provide for the recovery of included expenses without the necessity of a base rate proceeding.
Mr. Ruback testified that base rates should allow the utility the opportunity to recover prudently incurred operating and maintenance expenses, taxes and a fair return on investment that is used and useful in providing utility service, while fuel adjustment clauses are only intended to flow through any increases or decreases in fuel costs that are not included in base rates. He explained that the regulatory compact is deeply rooted in traditional utility regulation, and that such a regulatory compact exists between ENO and its customers. He stated that the regulatory compact requires that base rates be set for the time period that the rates are expected to be in effect and provides a utility with a monopoly for electric service within its service area. He indicated that base rates are prospective and are intended to allow the utility the opportunity to earn a fair rate of return. The basic “bargain” implicit in the regulatory compact is that the utility is granted a monopoly in the service area in exchange for a public service obligation to provide safe and reliable service at just and reasonable rates.
He testified that the regulatory compact also requires that the base rates not be changed between base rate cases, which provides the utility with a powerful incentive to minimize costs, minimize increases in costs, and to search for deficiencies in other areas of its operations to offset cost increases between the time base rates are set and when the base rates become effective. He explained that this incentive is powerful because the utility keeps any cost savings between rate cases, but must absorb any cost increases, and without this inducement there would be little incentive for the utility to minimize costs.
He noted that by including Period Costs in the fuel adjustment clause, ENO rids itself of any incentive to minimize Period Costs, such as fixed charges, interest 1 l3expense, operation and steam expense, general and administrative expenses and amortization of successful exploration activities. Without meaningful competition, an allowance of Period Costs in the fuel adjustment clause basically eliminates any incentive ENO has to minimize these costs. Therefore, allowing ENO to include Period Costs in the fuel adjustment clause is a failure of regulation, which is intended to be a surrogate for competition, in order to provide an incentive to minimize costs.
Mr. Ruback testified that there is no incentive to minimize Period Costs when such costs are included in the fuel adjustment clause because ENO is not at risk to absorb cost increases between base rate cases, and has no incentive to reduce Period Costs because ENO is not allowed to retain the savings between rate cases. He testified that the consequences are higher bills than are necessary for safe and reliable service to customers. The inclusion *92 of Period Costs in the fuel adjustment clause is a recipe for unjust and unreasonable rates and is an unusual exception to the costs typically included in fuel adjustment clauses.
Mr. Ruback testified that the only costs properly included in the fuel adjustment clause are costs which are: (1) large enough; (2) volatile enough; and (3) substantially beyond a utility’s control. If costs are not large enough, volatile enough or beyond a utility’s control, such costs should be included in base rates to provide an incentive to minimize costs. He pointed out that period or overhead costs should clearly not be included in the fuel adjustment charge but should be included in base rates, whenever ENO files for a base rate increase.[14]
|14I am mindful of the amount of discretion owed to the Council, as regulator. However, after reviewing the record in this matter, I do not find that it supports the Council’s decision. Based on the testimony and evidence in the record, I would find that the Council abused its discretion in refusing to order a refund of the SFI *93 Period Costs passed through ENO’s fuel adjustment clause to ratepayers.
| lfiIn Entergy Gulf States, Inc. v. Louisiana Public Service Commission, supra, the LPSC conduced an investigation of Entergy Gulf States’ (“Company”) fuel adjustment clause filings between 1988 and 1994. This Court explained that “under the fuel adjustment clause exception, a utility company is allowed to charge fuel costs directly to its customers on a monthly basis with only a retrospective review by the Commission. This procedure is allowed because the cost of fuel fluctuates, cannot reasonably be predetermined, and therefore, cannot be pre-set by the Commission.” Entergy Gulf States, 726 So.2d at 873. In that case, the Commission ordered refunds of certain fuel adjustment clause charges associated with the Company’s gas storage facility.[15] The Commission found that even though the expenses were not imprudently incurred, they were not properly recoverable through use of the fuel adjustment clause; rather, those costs were appropriate for consideration in a base rate proceeding. Id. at 874. The Commission reasoned that even though the expenses were fuel related, they were not properly recoverable through the fuel adjustment clause because they were predictable and constant. Id. The Commission noted that predictable costs should be considered in a base rate proceeding, which examines whether base rate offsets exist that would preclude a rate increase, and that base rate offsets are not considered in fuel proceedings. Thus, the Commission stated that it is essential to make sure that base rate costs are not passed through the fuel clause, even when they are portrayed as fuel-related. Id. at 874.
In explaining why these charges were disallowed, this Court noted:
The Commission found this practice objectionable because the expenses, which are not truly fuel expenses although they are related to fuel, are not properly recoverable through the use of the fuel clause. Rather, because these costs are considered predictable, known, or measurable costs, they are properly base rate charge items and the Company is required to bring the expenses before the Commission for its approval 11(iand inclusion in the base rate in an annual base rate proceeding. The Commission evaluates the Company’s total revenue requirements and determines if such expenses warrant an increase in rates only in base rate proceedings. The Commission explained that to allow the Company to use the fuel clause to pass through these costs directly to customers would allow the Company to circumvent the rate making process.
Id. at 890.
And, particularly relevant to this matter, the Commission noted that what made the Company’s activity even more objectionable to the Commission was the fact that the Company was under a base rate freeze during part of the review period, which would have precluded the Company from recouping these expenses properly through a base rate increase. Thus, the inclusion of these charges during the freeze through the use of the fuel clause effectively circumvented the effects of the base rate freeze. Id. at 890-891.
This Court found no error in the Commission’s decision ordering the refund, and affirmed the decision.
*94 I find no legitímate reason to distinguish ENO’s actions from those in the Entergy Gulf States case. In my view, the SFI period charges are not related to fluctuating fuel charges, and are not otherwise the type of charges that are properly included in the fuel adjustment clause. Thus, ENO improperly billed these charges to its customers, regardless of whether the charges themselves were prudent. The Council, as regulator, should have ordered a refund of these improperly billed charges. Most egregious in my mind is the fact that ENO was under a base rate freeze during much of the period at issue. Thus, had ENO attempted to realign SFI Period Costs to base rates during these years, it would not have been permitted to recover them. Instead, these costs were improperly passed through the fuel adjustment clause, thus enabling ENO to bypass the rate freeze.
For these reasons, I must respectfully dissent from the majority opinion.

. The summary of Mr. Janssen's testimony is adapted from the court of appeal opinion. Gordon v. Council of the City of New Orleans, 2005-1381 (La.App. 4 Cir. 2/25/08), 977 So.2d 212, 248-256.

. Janssen testified about a July 29, 1974 audit of NOPSI (now ENO) performed by the Department of Utilities. The purpose of the study was to determine if the fuel adjustment charges for May and June 1974 were correctly computed. The City of New Orleans Interoffice Memorandum attached to the report stated that: "it was concluded that the fuel charges as computed by Public Services were substantially correct except for certain administrative and interest charges assessed by System Fuels to Public Service for fuel oil which we do not consider to be properly chargeable to the cost of fuel within the meaning of the fuel cost adjustment clauses in the rate sched *86 ules. Departmental action will be taken to credit these charges in future customer billings.” The report also makes specific reference to administrative and interest components of SFI Period Costs, stating that this charges was not applicable in computing the fuel adjustment clause to customers, and noting that such charges were absorbed by NOPSI prior to the formation of SFI, and suggested that amounts previously billed to customers be credited to a future period fuel cost adjustment.

. ENO was under an agreed upon base rate freeze for ten of the fifteen years that were under review in this matter. The record reveals that ENO was under a base rate freeze from March 20, 1986-January 1, 1998, September 5, 1991-November 1, 1996, and November 5, 1998-October 1, 2001.

. He explained that the FERC has developed general principles and specific guidelines for both reviewing and ordering refunds on utilities' wholesale fuel adjustment clauses across the country. He indicated that these principles and guidelines can be found in various orders issued by the FERC in audits performed by its Staff. The orders and audits that he specifically reviewed and relied upon are: (1) FERC Orders in Docket No. ER76-285 (Phase II); (2) FERC Orders in Docket No. E-8570,(3) FERC's April 1977 Report on Results of Audit related to Charges for wholesale Electric Service by Mississippi Power and Light Company under Fuel Adjustment Clauses filed with the Federal Power Commission; and (4) FERC Orders in Docket Nos. FA86-63-000 and FA86-63-001.
Regarding Docket No. ER76-285 (Phase II), he testified that the FERC issued two (2) relevant orders; (1) Opinion No. 37, 6 FERC P 61,299, dated March 30, 1979 and (2) a November 19, 1979 order, denying rehearing. Specifically, these orders provide general principles related to retroactive rate-making and the prudence of costs passed through fuel adjustment clauses. He also stated that in the same proceeding, the FERC found that the Public Service Company of New Hampshire (PSNH) imprudently passed through its fuel adjustment clause, costs related to spot market purchases of 204,000 tons of coal when alternative supplies of cheaper coal were available. The FERC ordered PSNH to refund these imprudently incurred costs, plus interest.
He testified that the general principles contained in the FERC Docket No. ER76-285 (Phase II) are as follows:
• Public utility regulators have the ability to review the fuel adjustment clauses of their jurisdictional utilities to determine the prudence of costs recovered from their customers;
• Orders for refunds based on reviews of fuel adjustment clauses are not barred by principles against retroactive rate-making;
• Valid fuel clause formulas allow the inclusion of fuel expenses that are just and reasonable. If costs are included that should have been collected elsewhere, then one of the elements necessary for proper computation of fuel adjustments has been misstated; and
• Any inequities resulting from fuel adjustment clauses should be discovered through *87 surveillance and can be remedied through complaint proceedings. The responding utility should their present an affirmative defense.
Mr. Janssen further testified that in Docket No. E-8570, the FERC issued two orders relevant to this proceeding: (1) the Initial Decision on non-fuel costs adjustment issue, dated July 20, 1976; and (2) the April 26, 1970, order that Affirmed in Part and Modified in Part an initial decision on fuel adjustment clauses. These orders explained the intent and purpose of fuel adjustment clauses and the eligibility of certain types of costs to be included in fuel adjustment clauses. In the same proceeding, the FERC found that the Southern California Edison Company improperly included several costs in its fuel adjustment clause and it ordered the Southern California Edison Company to refund these improperly included costs, plus interest.
In Docket No. E-8570, he indicated that the general process from the proceeding is as follows:
• The intent and purpose of fuel adjustment clauses is to reflect changes in only the fuel component per kilowatt of energy cost and that this should be strictly construed.
• The cost of capital to acquire fuel and to maintain an adequate fuel inventory is not subject to treatment any different from the cost of capital for any other purpose. Financing costs are clearly not the kind of costs that may or should enter into computations tinder Commission-approved fuel adjustment clauses.
• The FERC's policy is to scrutinize costs reflected in fuel adjustment clauses to make sure only eligible fuel expenses are covered through the monthly fuel charge.
• The substance of costs is more important than the form when determining what costs are includable in fuel adjustment clauses.
• Fuel exploration and development costs should not be included in fuel adjustment clauses. A properly conceived and applied fuel adjustment clause cannot reflect such fixed, known in measurable costs without doing violence to both the intended purpose and the very rationale supporting the allowance of flow-through of particularly volatile fuel costs.
• Considerations of prudence are irrelevant to a proper determination of the legitimate fuel costs components includable in fuel adjustment clauses.
He also noted that in the FERC's April 1977, Report on Results of Audit related to Charges for wholesale Electric Service by Mississippi Power and Light Company under fuel adjustment clauses filed with the Federal Power Commission, the FERC's auditors published a report documenting their analysis of SFI Period Costs included in Entergy's wholesale fuel adjustment clauses and reached an agreement with the Entergy Operating Companies that excluded SFI Period Costs from inclusion in wholesale fuel adjustment clauses on a prospective basis. Additionally, he noted that the general principles contained in this April 1970 report are as follows:
• Utilities should not have the opportunity to recover through fuel adjustment clauses any fuel costs which ordinarily are incurred directly by utilities after obtaining delivery of fuel to the unloading point.
• Although costs may be proper cost of service items to be considered in setting utility base rates, they may not be properly accounted for as cost of fuel and therefore would be improperly included in fuel adjustment clauses.
Mr. Janssen stated that in FERC Docket Nos. FA86-63-000 and FA86-63-001, the FERC issued several orders and discussed the practice of Entergy Louisiana Inc. (ELI), as well as other Entergy Operating Companies, of passing SFI Period Costs through their wholesale fuel adjustment clauses. He testified that the orders and documents in these proceedings revealed that in both the late 1970s and early 1980s the FERC determined that SFI Period Costs were improperly included in the fuel adjustment clauses of En-tergy Operating Companies since those costs were not properly included in the FERC's System of Accounts as a fuel cost. In the late 1980s, Mr. Janssen noted, the FERC auditors found that ELI had reintroduced SFI Period Costs into its wholesale fuel adjustment clause, contrary to its previous agreement with the FERC documented in the April 1977 report. The FERC determined that the SFI Period Costs were improperly included and these costs were subsequently refunded to ELI's wholesale customers. The general principles found in these orders are as follows:
• Costs not properly includable in FERC Accounts as fuel costs are not properly recoverable from customers through fuel adjustment clause billings.
• '[Wjhile an automatic adjustment clause such as the fuel adjustment clause is part of the filed rate, the components of such clause remains subject to review and modification to ensure that only eligible cost *88 items are (lowed through to customers in the clause.'
• '[D]ue to the prohibition against retroactive rate-making, utilities which choose to disregard our accounting and rate regulations face the risk of permanently forfeiting every dollar, with interest, that they improperly recovered through their fuel clauses'

.In 1997, the LPSC issued a general order in Docket No. U-21497, which explicitly stated that in general, only the direct cost of fuel delivered to the plant site and other fuel related costs that are directly dependent upon the level of electricity generation or the energy cost of purchase power are recoverable through the fuel clause, and that the fuel clause should not be considered a supplement to or utilized to avoid the normal base rate-making process for incremental base rate costs and without the full consideration of all revenue requirements issues. Specifically excluded are: nonfuel operation and maintenance costs (accounting and other administrative costs); procurement costs (salaries, wages and overheads for personnel in fuel purchasing department); fuel handling and testing costs (personnel, equipment, and other overhead costs related to coal inventory at plant site); costs of byproduct disposal; property taxes; depreciation and amortization costs; lease expense; interest expense or carrying charges on capital investments and inventories; purchased power demand, capacity, or facilities charges; costs of and revenue from transmission for affiliated parties and firm sales revenue for demands, capacity or facilities.

. Janssen clarified that of the 35.3 million in Period Costs included in ENO’s fuel adjustment clause during the 171 months he examined, approximately 12.8 million occurred during the three base rate freeze periods.

. Mr. Janssen testified that in accounting for the depreciation of the majority of its fuel oil storage and handling facilities, SFI uses the double-declining balance method over a 16-year period, and that the use of this method allocates a larger amount of expense to the early years in which equipment is utilized and a decreasing amount in later years until the asset is fully depreciated after 16 years.

. The majority noted this internal memo, but discounted its value on the basis that the Council allegedly already knew ENO was *89 passing these costs through the fuel adjustment clause.

. The summary of Mr. Walsh's testimony is adapted from the court of appeal opinion. Gordon v. Council of the City of New Orleans, 2005-1381 (La.App. 4 Cir. 2/25/08), 977 So.2d 212, 271-274.

. FERC, Docket No. FA-17-000.

.The letter of May 28, 1997, particularly discussed expansion of ENO's SFI oil program strategy and included a statement indicating that Entergy was pursuing a plan to discontinue utilizing SFI to provide fuel oil and related storage services to the companies. However, Mr. Walsh indicated that the Enter-gy Operating Companies' dependence on SFI continues and that Entergy's plan never came to fruition. Thus, the FERC specifically identified Entergy's improper reporting of SFI Period Costs in Account 501 and subsequently recommended the correct accounting treatment. However, for reasons unknown, Mr. Walsh noted that ENO continued reporting its SFI Period Costs without any change from its historically applied method of flowing fixed costs through its fuel adjustment clause.

. The summary of Mr. Chavanne's testimony is adapted from the court of appeal opinion. Gordon v. Council of the City of New Orleans, 2005-1381 (La.App. 4 Cir. 2/25/08), 977 So.2d 2 32, 260-261.

. The summary of Mr. Ruback’s testimony is adapted from the court of appeal opinion. Gordon v. Council of the City of New Orleans, 2005-1381 (La.App. 4 Cir. 2/25/08), 977 So.2d 212, 256-260.

. Mr. Ruback also testified that he agreed with several regulatory principles referred to in Mr. Janssen's testimony:
• Public utility regulators have the ability to review the fuel adjustment clauses of the jurisdictional utilities to determine the prudence of costs recovered from their customers:
• Orders for refunds based on reviews of fuel adjustment clauses are not barred by principles against retroactive rate making;
• Valid fuel clause formulas allow the inclusion of fuel expenses that are just and reasonable. If costs are included that should have been collected elsewhere, then one of the elements necessary for proper computation of fuel adjustment has been misstated;
• Any inequities resulting from fuel adjustment clauses should be discovered through surveillance and can be remedied through complaint proceedings. The respondent utility should then present an affirmative defense;
• The intent and purpose of fuel adjustment clauses are to reflect changes in only the fuel component per kilowatt energy cost and this should be strictly construed;
• The cost of capital to acquire fuel and to maintain an adequate fuel inventory is not subject to treatment any different from the cost of capital for any other purpose. Financing costs are clearly not the kind of costs that may or should enter into computations under the Council approved fuel adjustment clause;
• Fuel exploration and development costs should not be included in fuel adjustment clauses. A properly conceived and applied fuel adjustment clause cannot reflect such fixed, known and measurable costs without doing violence to both the intended purpose and the very rationale supporting the allowance of flow through particularly volatile fuel clause;
• Costs not properly includable in FERC Accounts are not properly recoverable from customers through fuel adjustment clause billings;
• While an automatic adjustment clause such as the fuel adjustment clause is part of the filed rale, the components of such clause remain subject to review and modification to ensure that only eligible cost items are flowed through to customers under this clause;
• Due to the prohibition against retroactive rate making, utilities which choose to disregard accounting and rate regulations face the risk of permanently forfeiting every dollar, with interest, that they improperly recovered or their fuel clause;
• A utility's subsidiary should not profit on transactions included in its affiliated utility's fuel adjustment clause.
• Transactions with a utility affiliate should be reviewed for prudent management judgment and acquiring fuel [or power] at the lowest competitive prices;
• As the name implies, fuel adjustment clauses are not designed to allow utility to earn a profit; rather they are a recoupment device designed to permit a dollar for dollar recovery of fluctuations in fuel costs; and
• The requirements of fairness which compels adjustment in rates to compensate utilities for escalating fuel costs also compels retrospective reconciliation to exclude charges identifiably resulting from unreasonable computations or inclusions.

. These charges included certain capital costs of the gas storage facility, and certain gas inventory charges.